**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, CHICAGO DIVISION**

| | | |
|---|---|---|
| PATRICK TAYLOR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. |
| v. | ) | |
| | ) | |
| CITY OF ROLLING MEADOWS, DANIEL | ) | |
| COOK, MARK HINDS, ROBERT "BOB" | ) | |
| DOUCET, TOM GADOMSKI, PHILIP | ) | |
| BARRILE, STEVE CARDONA, MARK | ) | |
| RECKER, RAY PETERS, and JOSEPH | ) | **JURY TRIAL DEMANDED** |
| WALTZMAN, in their individual capacities, | ) | |
| VILLAGE OF PALATINE, TIM | ) | |
| SHARKEY, in his individual capacity, AL | ) | |
| BAUMGARTNER, in his individual | ) | |
| capacity, and VILLAGE OF ARLINGTON | ) | |
| HEIGHTS, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

Plaintiff, PATRICK TAYLOR, by his undersigned attorneys, Loevy & Loevy and the

Law Offices of Steven A. Greenberg, complain of Defendants as follows:

**Introduction**

1.      Patrick Taylor was incarcerated for more than 16 years for a crime he did not

commit: the murder of Marquis Lovings.

2.      The State even sought to have Mr. Taylor executed for Lovings' death.

3.      Once the death penalty was abolished, the State secured a sentence of life-

imprisonment for Mr. Taylor.

4.      Mr. Taylor has steadfastly maintained his innocence.

5.      The only evidence implicating Mr. Taylor was false and fabricated.

6.      As described below, several unreliable misidentifications were manufactured by Defendants through undisclosed coercion and undisclosed suggestive identification procedures.

7.      Even worse, Defendants' manufactured false case against Mr. Taylor had the added benefit of allowing the real murderers to go free.

8.      In 2023, on the eve of a retrial, Mr. Taylor unearthed boxes of exculpatory materials withheld by Defendants.

9.      That undisclosed exculpatory evidence completely dismantled the State's case.

10.     By this time, Mr. Taylor's team also amassed significant evidence implicating Marcus Gordon and Aaron "Knows" Feazell as the true perpetrators.

11.     On October 11, 2023, the State finally dismissed all charges against Mr. Taylor.

12.     Later that evening, Mr. Taylor was finally set free.



13.     Mr. Taylor seeks justice for the irreversible damage that was done.

**Jurisdiction**

14.     This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Plaintiff's rights as secured by the United States Constitution and Title VII of the Civil Rights Act.

15.     This Court has jurisdiction of Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 and § 1343.

16.     Venue is proper under 28 U.S.C. § 1391(b).

17.     The majority of Defendants reside in this district and the events and omissions giving rise to Plaintiff's claims occurred in this district.

**Parties**

18.     Patrick Taylor is a 57-year-old resident of Texas.

19.     At all relevant times, Defendants Daniel Cook, Mark Hinds, Robert Doucet, Thomas Gadomski, Phil Barrile, Steve Cardona, Mark Recker, Ray Peters, and Joseph Waltzman were police officers in the Rolling Meadows Police Department.  They are sued in their individual capacity and acted under color of law and within the scope of their employment during the investigation at issue.

20.     At all relevant times, Defendant Tim Sharkey was a police officer in the Palatine Police Department. He is sued in his individual capacity and acted under color of law and within the scope of his employment during the investigation at issue.

21.     At all relevant times, Defendant Al Baumgartner was a police officer in the Arlington Heights Police Department. He is sued in his individual capacity and acted under color of law and within the scope of his employment during the investigation at issue.

22.     City of Rolling Meadows is an Illinois municipal corporation, and as such is responsible for the policies, practices, and customs of the Rolling Meadows Police Department.

The City of Rolling Meadows is and/or was the employer of Defendants Daniel Cook, Mark Hinds, Robert Doucet, Thomas Gadomski, Phil Barrile, Steve Cardona, Mark Recker, Ray Peters, and Joseph Waltzman. The City of Rolling Meadows is responsible for the acts of these Defendants while employed by the City of Rolling Meadows and while acting within the scope of their employment.

23.     The Village of Palatine is an Illinois municipal corporation and as such is responsible for the policies, practices, and customs of the Palatine Police Department. The Village of Palatine is and/or was the employer of Defendant Sharkey. The Village of Palatine is responsible for the acts of these Defendant Sharkey while employed by the Village of Palatine and while acting within the scope of his employment.

24.     The Village of Arlington Heights is an Illinois municipal corporation and as such is responsible for the policies, practices, and customs of the Arlington Heights Police Department. The Village of Arlington Heights is and/or was the employer of Defendant Baumgartner. The Village of Arlington Heights is responsible for the acts of this Defendant while employed by the Village of Arlington Heights and while acting within the scope of his employment.

25.     At all times relevant to this action, each of the named individual Defendants acted individually and/or collectively, under the color of the laws, regulations, and customs of the State of Illinois.  Each Defendant's actions constituted "state action" as defined under federal law.

**The Tragic Shooting of Lovings and Barraza**

26.     On August 19, 2006, two Black males entered Marquis Lovings' Rolling Meadows apartment, robbed two safes, and when the robbery plan went sideways, they killed Mr. Lovings.

27.     Lovings' killers also shot Michael Barraza upon fleeing the residence.

28.     The investigation into Lovings' death was conducted by a joint task force led by

4

Detective Dan Cook of the Rolling Meadows Police Department.

29.     At the onset of the investigation, officers from several law-enforcement agencies conducted a comprehensive canvass of the complex looking for potential eyewitnesses.

30.     Through those efforts, officers discovered several witnesses who had personal knowledge of individuals responsible for Lovings' death.

31.     Juanito Gonzalez is one such witness.

32.     In August 2006, Mr. Gonzalez's family lived in Lovings' apartment building. On August 19, 2006, Mr. Gonzalez dropped his sister off at his mother's residence around 9:30 p.m. Mr. Gonzalez remained inside the residence for approximately "10-20 minutes."

33.     After leaving the residence, Mr. Gonzalez "started walking towards the parking lot and saw a cream/beige vehicle drive by." Mr. Gonzalez was "suspicious and was on alert as the driver of the vehicle saw [him], glanced towards [him], and the vehicle paused before driving on."

34.     Mr. Gonzalez reveals that the vehicle "was occupied by two black males driving in the parking lot close to [his] mother's building. The vehicle caught [his] attention because they were acting suspiciously."

35.     Given how close the vehicle was to Mr. Gonzalez, he was able to "observe the individuals inside…" The occupants of the vehicle "were two black males, short hair, medium build, and looked to be in their early 20's."

36.     Mr. Gonzalez observed "the two men driving in a Cream/Beige colored vehicle that was a Chrysler or Plymouth."

37.     Mr. Gonzalez identified the Chrysler Pacifica Touring Edition below as looking "similar in color and form to the type of vehicle driven by the two black males [he] saw driving in front of [his] mother's building on August 19, 2006."

 

38.     Mr. Gonzalez left the complex shortly after observing the two Black males driving the Chrysler Pacifica.

39.     On August 20, 2006, law-enforcement officers interviewed Mr. Gonzalez at the Rolling Meadows Police Department.

40.     The investigative file portrays the questioning of Mr. Gonzalez as a standard interview of a third-party witness.  It wasn't.

41.     Defendant Tim Sharkey of the Palatine Police Department coercively interrogated Mr. Gonzalez to extract a (false) confession.

42.     As Mr. Gonzalez now reveals, Defendant Sharkey shoved, pushed, and threw him around the interrogation room as he accused Gonzalez of committing murder.

43.     Defendant Sharkey threw Gonzalez against a wall while handcuffed for no reason.

44.     Later, Defendant Sharkey tried to fabricate a false statement for Gonzalez implicating someone else in the murder.

45.     Defendant Sharkey's efforts failed.

46.     Defendant Sharkey withheld exculpatory and impeachment evidence concerning Mr. Gonzalez.

47.     That information was buried for nearly two decades and only unraveled on the eve of Mr. Taylor's retrial when Mr. Gonzalez revealed the circumstances of his interrogation.

**Elemuel Huizar Also Witnessed Two Perpetrators Run to a Beige
Two-Toned SUV and Flee the Scene**

48.     In 2006, Elemuel Huizar lived in Mr. Lovings' apartment complex.

49.     On the night of the shooting, Mr. Huizar arrived home that evening with his wife and child around 10:00 p.m. While in the parking lot, Mr. Huizar heard someone yelling "hey" before hearing what "he thought were fireworks, maybe M-80's going off."

50.     At that point, Mr. Huizar "observed two male subjects running south through the parking lot and disappear behind the east side of the dumpster" near the victim's building.

51.     Then, Mr. Huizar "observed a vehicle pull out from a space by the dumpster and drive toward [him]."  At the time, "the vehicle's lights were off and it was traveling very fast."

52.     Mr. Huizar recognized the vehicle to be a "two-toned SUV. The top color was tan and the bottom was gray with tinted windows in the back."

53.     Critically, Mr. Huizar attests that the "vehicle was a newer model and looked like a Buick Rendezvous."[1]

54.     Mr. Huizar noticed that the SUV "did not slow down as it entered onto Euclid Avenue" and "witnessed it nearly get into an accident.

55.     On August 25, 2006, Mr. Huizar truthfully provided this information to law-enforcement.

---

[1] At the time, the Chrysler Pacifica mirrors the appearance of a Buick Rendezvous.

56.     The case went cold for nearly another year.

**Defendants Fabricate Kenneth Slaughter's Statement**

57.     By August 2007, Defendants set out to frame Mr. Taylor.

58.     Over the course of several days, Defendant Cook and others conspired with one another to fabricate Kenneth Slaughter's false statement

59.     Defendant Cook led the effort to fabricate Slaughter's false statement.

60.     On August 30, 2007, Mr. Slaughter had a court appearance in Chicago, Illinois.

61.     There, Defendant Cook and another detective located Mr. Slaughter and took him in for questioning at the Rolling Meadows Police Department.

62.     Slaughter was taken to the RMPD in the rear of a squad car.

63.     After arriving, all of Slaughter's belongings – including his cell phone – were taken from him by law-enforcement.

64.     There, Mr. Slaughter repeatedly informed Defendants Cook and Barrile that he had no direct knowledge regarding the Lovings' homicide.

65.     Even still, Defendants Cook and Barrile continued to try to fabricate a false statement for Slaughter that implicated Plaintiff in the murder.

66.     Defendant Cook then enlisted assistance from Arlington Heights Detective Al Baumgartner to conduct a Computerized Voice Stress Analysis test (CVSA).

67.     Defendant Baumgartner's testing of Mr. Slaughter was nothing more than a ruse.

68.     When Mr. Slaughter continued to maintain that he did not have any information about the Lovings' murder, he was taken to a Motel 6 overnight, where Slaughter was surrounded by law-enforcement and not free to leave.

69.     Slaughter was still without access to a phone or the outside world.

70.     Throughout his two-day nightmare, Slaughter was repeatedly denied access to the phone.

71.     Defendants did so as part of their conspiracy to fabricate a false statement for Slaughter.

72.     The following morning, Slaughter was taken for a polygraph at Hunter & Associates.

73.     This testing of Mr. Slaughter was also nothing more than a ruse.

74.     Mr. Slaughter again repeatedly maintained that he had no direct knowledge regarding the Lovings' homicide.

75.     After, Defendants Cook and Gadomski questioned Slaughter again at the Rolling Meadows Police Department.

76.     Slaughter was again threatened and fed false information.

77.     Slaughter was scared for his life.

78.     At times, Defendants made undisclosed promises of consideration to Slaughter.

79.     After nearly two days of intense questioning, Defendants successfully fabricated a false statement for Slaughter that implicated Plaintiff in the Lovings' murder.

80.     To do so, Defendant Cook and other Defendants fed Slaughter false information and coerced him into repeating it.

81.     Defendant Cook and other Defendants manufactured this false statement – and coerced Slaughter into repeating it – knowing that it was false.

82.     During the coercive questioning that led to the fabricated statement, Slaughter repeatedly informed Defendants that he did not see what they were telling him to falsely repeat.

83.     Despite this, Defendants plowed forward with his fabrication.

84. Defendants knew that the statement they fabricated for Slaughter was false but fabricated the statement so that they could prosecute Plaintiff for murder.

**Defendants Used Undisclosed Suggestive Identification Procedures to Manufacture Four Unreliable Misidentifications from Eyewitnesses**

85. Prior to Mr. Taylor being charged, Defendants Hinds, Cook, and Doucet conducted unduly suggestive identification procedures with eyewitnesses that resulted in misidentifications of Mr. Taylor.

86. Defendants withheld evidence that would have illustrated just how unduly suggestive and unreliable the procedures truly were.

87. These unreliable and suggestive procedures resulted in several misidentifications of Mr. Taylor prior to charges being initiated.

88. Defendants withheld the suggestive identification procedures from the State.

89. The misidentifications of Mr. Taylor – obtained through the withheld suggestive identification procedures – were used to secure charges and Mr. Taylor's wrongful conviction.

**Fabrication of Jeff Nowden's Statement**

90. In 2007, Defendants Hinds and Cook met with Jeff Nowden.

91. Mr. Nowden informed Defendants Hinds and Cook that he did not have any information implicating Mr. Taylor in the Lovings' homicide.

92. Nonetheless, Defendants Hinds and Cook fabricated a false statement for Mr. Nowden claiming that Mr. Taylor was "bragging about the murder" and had "a lot of money and weed" on him the day after Lovings was killed.

93. This information was false and fabricated by Defendants.

94. Defendants withheld the unconstitutional methods they used to fabricate this false statement from Mr. Taylor and his counsel.

**Plaintiff is Prosecuted for Murder**

95.     Based on the fabricated evidence recounted above and withheld unduly suggestive identification procedures resulting in misidentifications, Mr. Taylor was charged with Lovings' murder in August 2007.

96.     The only evidence supporting the charges was fabricated statements and misidentifications that were the product of undisclosed suggestive identification procedures.

97.     Defendants knew that there was no probable cause against Mr. Taylor.

98.     Between 2007 and 2011, Defendants actively took steps to conceal their misconduct while withholding exculpatory evidence that would have ended Mr. Taylor's criminal prosecution.

99.     At trial, Defendants testified falsely and concealed exculpatory evidence as part of their ongoing conspiracy to frame Mr. Taylor for a crime he did not commit.

100.    In 2011, Mr. Taylor was wrongfully convicted of murder based on false and fabricated evidence, withheld exculpatory and impeachment evidence, and misidentifications that were the product of undisclosed unduly suggestive identification procedures.

101.    Mr. Taylor was sentenced to life imprisonment.

**After Mr. Taylor Obtains New Trial, His Legal Team Unearths Boxes of Withheld Exculpatory Evidence**

102.    In preparation for retrial, Mr. Taylor repeatedly filed discovery motions.

103.    On April 12, 2023, pursuant to Court order, the RMPD produced boxes, containers, and binders to the Rolling Meadows Courthouse for inspection.

104.    After 16 years, Mr. Taylor's counsel learned for the first time that Defendants withheld containers of street files from their investigation into Lovings' death.  The Defendants who withheld this exculpatory evidence include: (1) Defendant Cook; (2) Defendant Cardona; (3) Defendant Recker; (4) Defendant Peters; and (5) Defendant Waltzman.






105.    These containers contained thousands of pages of documents, including exculpatory and impeachment evidence that was never disclosed to Mr. Taylor during the near two-decade prosecution of this case.

106.    Some of this withheld exculpatory evidence includes: (1) evidence that would have proven the motive for certain members of Lovings' family to falsely implicate Plaintiff; (2) evidence demonstrating that center members of Lovings' family was deeply involved in his criminal endeavors; (3) certain members of Lovings' family were uncooperative and controlling the underlying criminal investigation; (4) certain members of Lovings' family had a demonstrated pattern of witness tampering in criminal investigations; (5) evidence linking a beige vehicle to the Lovings' murder; (6) evidence implicating Aaron "Nose" Feazell in the murder; (7) evidence confirming that Mr. Taylor did not own nor possess a vehicle fitting the description provided by witnesses; (8) evidence demonstrating the falsity of Slaughter's statement; and (9) evidence implicating additional alternate suspects.

### Defendants Withheld Exculpatory Evidence Demonstrating that Marcus Gordon and Aaron "Nose" Feazell Killed Marquis Lovings

107.    Within the boxes of withheld exculpatory evidence was evidence linking a beige SUV to Lovings' murder.

108.    Not by coincidence, Marcus Gordon and his close associate, Aaron Feazell, had access to the beige SUV used to kill Mr. Lovings.

109.    According to documents withheld by Defendant Cook for years, Feazell owned one.

110.    Undisclosed police records obtained by Defendant Cook associate Feazell as a member of the Crazy Crew. Crazy Crew was a west-side gang with which both Feazell and Gordon were associated.

111.    An Accurint report obtained by Defendant Cook on August 18, 2009, reflects that Mr. Feazell owned a 2005 Chrysler Pacifica SUV in 2006 that was registered to an address on the west side of Chicago.

112.    Given that multiple eyewitnesses informed law-enforcement during the underlying investigation that a Beige SUV was used in the commission of the murder, Defendant Cook readily understood the importance of this piece of information.  For this reason, he highlighted this portion of the report.

113.    Importantly, the investigation into the beige vehicle continued beyond the initial investigation.

114.    Previously withheld exculpatory evidence confirms that Defendant Cook investigated Feazell after he was linked directly to the murder weapon in 2009.  In that investigation, Defendant Cook confirmed that Feazell owned a 2005 Chrysler Pacifica, learned the VIN, and even obtained the plate number.  Defendant Cook even highlighted Feazell's vehicle and tag number on the document.

115.    By August 18, 2009, Defendant Cook knew that Feazell owned a vehicle fitting the description provided by Gonzalez, Huizar, and Barraza (according to the handwritten notes).

116.    Defendant Cook – among other Defendants – buried this exculpatory evidence as part of a conspiracy to frame Mr. Taylor for a crime he did not commit.

117.    But there is more.

118.    At the same time Defendant Cook withheld exculpatory evidence linking Feazell and Gordon to the murder vehicle, newly discovered evidence obtained from the withheld RMPD files confirms that Defendant Cook also conducted an intense investigation of Mr. Taylor prior to the 2011 trial.

119.    Defendant Cook tried to tie Mr. Taylor to the beige SUV.

120.    Defendant Cook sought records from the Chicago Police Department requesting information related to Mr. Taylor's prior arrests, "offenders arrested with Taylor, vehicle info."

121.    Defendant Cook also conducted a comprehensive background report on Mr. Taylor that appears to have been updated in 2019 as Mr. Taylor unraveled evidence implicating Gordon and Feazell in the murders.

122.    These efforts confirmed that Mr. Taylor never owned a vehicle fitting the description provided by the eyewitnesses.

123.    Defendant Cook buried this exculpatory evidence as well.

**Marcus Gordon Shot Larry Neumann in 2006
With Lovings' Murder Weapon**

124.    It's not just the beige SUV that links Gordon and Feazell to Mr. Lovings' homicide.

125.    The weapon used to murder Mr. Lovings is linked to Gordon and Feazell as well.

126.    On April 10, 2006, Marcus Gordon used a .40 caliber Glock to shoot at a Chicago Police Officer named Larry Neumann.  Fred Tomasek, a forensic scientist specializing in the field of firearms and tool marks identification at the Illinois State Police Laboratory, confirms that the weapon used to shoot at Officer Neumann was the same weapon used to kill Mr. Lovings three months later.

127.    During the Neumann shooting investigation, Gordon ("Cadillac") was identified by Officer Neumann and another eyewitness, Thomas Jones, in multiple photo-arrays and in live line-ups.

128.    In an interview at the Chicago Police Department on August 9, 2006, "[Thomas] Jones stated that "Cadillac" was the person who shot at Officer Neuman.  Jones knew this because he personally witnessed "Cadillac" shooting the gun at Officer Neuman."

129.    After the interview, Jones "positively identified Marcus Gordon as the person who fired a handgun at the victim, P.O. Larry Neuman."

130.    Similarly, on August 10, 2006, "Officer Neuman viewed the photo line-up and positively identified participant #5, Marcus Gordon, as the person who was shooting at him with an unknown type of semi-automatic pistol.  Officer Neuman indicated this by pointing to the picture of Marcus Gordon while stating, "That's him.""

131.    On September 7, 2006, Officer Neumann viewed a live lineup – to which he provided a tentative identification of Gordon.  Even still, Gordon was never questioned nor charged with shooting at Officer Neumann.

132.    Five years later, Officer Neumann testified at Mr. Taylor's first trial that Gordon shot him.

**Lovings' Murder Weapon Connected to Both Feazell and Gordon**

133.    While Lovings' murder weapon was used by Gordon in April 2006 to shoot at Officer Neumann, law-enforcement also linked the weapon to Feazell.

134.    On this score, the murder weapon was recovered from Arthur Patterson by law-enforcement on January 30, 2008.

135.    By 2009, the Illinois State Police laboratory connected the weapon to the Lovings' murder and Officer Neumann's shooting.

136.     On July 19, 2009, Defendant Cook questioned Patterson about the weapon. During that questioning, Patterson advised that he "received the Glock .40 caliber from a subject with the nickname "nose" in the fall of 2008."

137.     Defendant Cook was quickly advised by the Cook County Sheriff's Police Intelligence Unit that "Nose" is Aaron Feazell.

138.     When shown a photograph, Patterson "immediately identified Aaron Feazell as the person who gave him the Clock with the extended magazine."

139.     A separate interview of Ray Gary Jr. corroborated Patterson's account that the Lovings' murder weapon – and weapon used to shoot at Officer Neumann – was given to Patterson by Feazell.

### The Eyewitness Descriptions of Lovings' Murderer Have Always Fit Gordon

140.     Charles Bjelica, Kevin Gholston, Marya Klein, Armando Vera, and Michael Barraza were present in the apartment where Lovings was killed.

141.     Given that the other witnesses in the apartment were forced to the ground and had pillows covering their heads for lengthy periods of time, law-enforcement viewed Mr. Barraza as a significant eyewitness to the incident.

142.     During the first week of the investigation, Barraza was interviewed by law-enforcement on three separate occasions.

143.     In the first interview on August 20, 2006, Mr. Barraza explained that on the night of the shooting he went to Lovings' apartment to meet Lovings and Mr. Vera.  Like the others, Mr. Barraza planned to see Aimee (Lovings' girlfriend) sing at a club.

144.     After Lovings arrived, Mr. Barraza entered the residence with him, Mr. Vera, and Ms. Klein.  Once inside, "two offenders described above burst through the front door armed with handguns."  At one point, Mr. Barraza:

> saw that offender #1 was standing over Marquis and offender #2 was standing near the door.  Offender #1 asked offender #2, "Which one of these mother-fuckers should I shoot next?"  Offender #2 stated, "shoot that [expletive] over there," while motioning towards Barraza.  Fearing that he was about to be shot, Barraza jumped up and pushed past offender #1.  Barraza ran towards the door and offender #2 dropped his gun.  Barraza pushed offender #2 into the wall and ran out of the residence.

145.     Outside, Mr. Barraza was "zigzagging back and forth" as he was being chased.  At some point, as Mr. Barraza made a turn, he saw "offender #2 running towards him from the area of Marquis's residence.  Offender #2 stopped, aimed his gun at Barraza, and fired one shot into Barraza's midsection."

146.     Given his direct interactions with both perpetrators, Mr. Barraza was able to provide a detailed description to officers:

| Offender 1: | Unknown M/B, 25-30 YOA, 5/10, thin build, short mussed hair, mustache LSW:  orange top and bottom (sweat suit), armed with handgun, possibly MAC 11 |
| --- | --- |
| Offender 2: | Unknown M/B, 25-30 YOA, 6'02, medium build, short hair LSW:  white t-shirt and blue jeans, armed with handgun, possibly MAC 11 |

### Law-Enforcement Creates Composite of the Shooter

147.     On August 22, 2006, Mr. Barraza also met with Detective Pinnello at Lutheran General Hospital.  Detective Pinnello was a composite sketch artist from the Arlington Heights Police Department.  Pinello drew a composite using Barraza's description.

148.     As Detective Pinnello testified at Mr. Taylor's 2011 trial, Mr. Barraza participated in the creation of the composite until he was satisfied with its likeness.

149.     Once Mr. Barraza advised that there were no further changes to be made to the composite, Detective Pinnello's role concluded.  At that point, the composite was complete.

150.     Importantly, the composite sketch was adopted by each of the remaining three eyewitnesses during the underlying investigation.

151.     As shown, the composite sketch bears a strong resemblance to Marcus Gordon.



152.     The composite sketch bears no resemblance to Patrick Taylor.

**The Remaining Eyewitnesses Descriptions of the Shooter Fit Gordon**

153.     Early in the investigation, each of remaining eyewitnesses were questioned and provided law enforcement with consistent descriptions of the shooter prior to testifying at Mr. Taylor's initial trial.

154.    Together, the eyewitnesses describe the shooter as:

| Eyewitness | Age | Height | Weight | Complexion | Hair |
|---|---|---|---|---|---|
| Kevin Gholston | **29-30** | 5'9" | **Thin** | **Dark skin** | N/A |
| Michael Barraza | **25-30** | **5'10"** | **Thin** | N/A | **Short, Mustache** |
| Armando Vera | N/A | 5'7" – **5'10"** | Medium build | **Dark skin** | **Short** |
| Veljko Bjelica | **25-30** | **5'10"** | 190 pounds | **Dark skin** | **Razor short** |
| Marya Klein | N/A | **5'10"** | **Thin** | N/A | N/A |

155.    Marcus Gordon was arrested by the Chicago Police Department less than three weeks after the murder of Marquis Lovings.

156.    Mr. Gordon appeared as follows at the time of this arrest:

| Witness | Age | Height | Weight | Complexion | Hair |
|---|---|---|---|---|---|
| Marcus Gordon | **30** | 6'0" | **Thin** | **Dark skin** | **Short Hair, Mustache** |

157.    The eyewitness descriptions fit Gordon's appearance in August 2006.

158.    These descriptions do not fit Mr. Taylor.

**Mr. Taylor's Injuries**

159.    Mr. Taylor was charged with murder on August 6, 2007.

160.    Since then, his life has never been the same.

161.    At the time of charging, Mr. Taylor's son "King" was only two months old.

162.    Mr. Taylor missed the first 16 years of his son's life due to Defendants' egregious misconduct.

163.    In 2010, Mr. Taylor's mother died and he was unable to attend her funeral. At the time, he still faced murder charges.

164. Mr. Taylor was diagnosed with diabetes as he awaited trial at the Cook County Jail.

165. While incarcerated between 2007 and 2023, Mr. Taylor suffered extensive health problems and repeatedly had surgeries to address ongoing medical issues.

166. On November 3, 2011, Mr. Taylor was sentenced to life in prison.

167. After his wrongful conviction, Mr. Taylor filed several appeals that ultimately resulted in a new trial being granted in 2016.

168. The court denied Mr. Taylor's direct appeal on October 30, 2014.

169. Mr. Taylor's conviction was reversed on September 22, 2016.

170. Mr. Taylor spent more than 15 years in prison for a crime he did not commit.

171. For nearly seven years, Mr. Taylor languished in the Cook County Jail awaiting retrial.

172. Mr. Taylor suffered injuries every day of his wrongful incarceration.

173. Mr. Taylor's arrest and wrongful conviction caused Mr. Taylor to lose his job, and his future job prospects, skills, and income he would have acquired during his wrongful detention and after his release.

174. During his wrongful incarceration, Mr. Taylor was stripped of the various pleasures of basic human experience, from the simplest to the most important, which all free people enjoy as a matter of right. He missed out on the ability to raise his child, share holidays, births, funerals, and other life events with loved ones, and the fundamental freedom to live one's life as an autonomous human being.

175. Mr. Taylor also suffered physical injuries during his incarceration. Those injuries included the lack of adequate medical care. Those struggles caused Mr. Taylor to suffer on a daily basis.

176. As a result of his wrongful incarceration, Mr. Taylor must now attempt to rebuild his life.

177. Mr. Taylor has suffered tremendous damage, including physical sickness and injury and emotional damages, all proximately caused by Defendants' misconduct.

**Plaintiff's Exoneration**

178. On April 13, 2023, Mr. Taylor filed a motion to dismiss due to Defendants' egregious misconduct.

179. On April 24, 2023, Mr. Taylor filed a Motion for Discovery relating to Defendants' withholding of exculpatory evidence.

180. On September 28, 2023, Mr. Taylor filed a Supplement.

181. On October 3, 2023, Mr. Taylor filed a Reply in Support of his Motion to Dismiss.

182. Prior to a hearing, the State dropped charges against Mr. Taylor on October 11, 2023.

**Count I - 42 U.S.C. § 1983**
**Due Process**
**All Defendants**

183. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

184. As described more fully above, Defendants, while acting individually, jointly, and in conspiracy, as well as under color of law and within the scope of their employment, deprived Mr. Taylor of his constitutional right to a fair trial.

22

185.     In the manner described more fully above, the Defendants conducted a reckless investigation, withheld exculpatory evidence, withheld impeachment evidence, destroyed evidence, and fabricated false reports, false statements, false testimony, and other evidence. Absent this misconduct, the prosecution of Mr. Taylor could not and would not have been pursued.

186.     Defendants' misconduct also directly resulted in the unjust criminal conviction of Mr. Taylor, thereby denying each of his constitutional right to a fair trial in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

187.     As a result of this violation of his constitutional right to a fair trial, Mr. Taylor suffered injuries including but not limited to emotional distress and pain and suffering, as is more fully alleged above.

188.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally and with willful indifference to Mr. Taylor's constitutional rights.

189.     The misconduct described in this Count was undertaken pursuant to a routine practice of the Department to pursue wrongful convictions through reckless and profoundly flawed investigations, provision of false evidence and reports, coerced evidence, and failure to properly supervise employees knowing that those employees were providing false evidence.  In this way, the municipal defendants violated Mr. Taylor's rights by maintaining policies and practices that were the moving force driving the foregoing constitutional violations.

190.     These widespread practices, so well-settled as to constitute *de facto* policy in the Department, were able to exist and thrive because municipal policymakers with authority over the Division of Police exhibited deliberate indifference to these problems, thereby effectively ratifying them.

191.     The widespread practices described in the preceding paragraphs were allowed to flourish because the municipal Defendants declined to implement sufficient training and/or enforce legitimate oversight and punishment.

**Count II – 42 U.S.C. § 1983**
**Deprivation of Liberty Without Probable Cause**
**Fourth and Fourteenth Amendments**
**All Defendants**

192.     Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

193.     As described more fully above, the Defendants, individually, jointly and in conspiracy with each other, as well as under color of law and within the scope of their employment, deprived Mr. Taylor of his constitutional right to be free from unlawful prosecution and continued detention without probable cause.

194.     In the manner described more fully above, the Defendants made, influenced and/or participated in the decision to prosecute Mr. Taylor for these crimes, for which prosecution there was no probable cause and which caused Mr. Taylor to suffer a deprivation of liberty.  Their misconduct included falsifying evidence and withholding exculpatory evidence.

195.     The Defendants' misconduct directly resulted in the unlawful prosecution and incarceration of Mr. Taylor, thereby denying each of his constitutional right to liberty in violation of his constitutional rights.

196.     As described more fully above, the prosecution was ultimately resolved in Mr. Taylor's favor.

197.     Because of this violation of his constitutional rights, Mr. Taylor suffered injuries, including but not limited to bodily harm and emotional distress, as is more fully alleged above.

198.    The Defendants' misconduct, as described in this Count, was objectively unreasonable and was undertaken intentionally with malice and willful indifference to Mr. Taylor's constitutional rights.

199.    The misconduct described in this Count was undertaken pursuant to a routine practice of the Department to pursue wrongful prosecutions and wrongful convictions through reckless and profoundly flawed investigations and coerced evidence.  In this way, the municipal defendants violated Mr. Taylor's rights by maintaining policies and practices that were the moving force driving the foregoing constitutional violations.

200.    These widespread practices, so well-settled so as to constitute *de facto* policy in the Department, could exist and thrive because municipal policymakers with authority over the Division of Police exhibited deliberate indifference to the problem, thereby effectively ratifying it.

201.    The widespread practices described in the preceding paragraphs could flourish because the municipal defendants declined to implement sufficient training and/or enforce legitimate oversight and punishment.

### Count III - 42 U.S.C. § 1983
### Failure to Intervene: All Defendants

202.    Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

203.    In the manner described above, during the constitutional violations described above, one or more of the Defendants stood by without intervening to prevent the misconduct, despite having a reasonable opportunity to do so.

204.    Because of the Defendants' failure to intervene to prevent the violation of Mr. Taylor's constitutional rights, Mr. Taylor suffered pain and injury, as well as emotional distress.

205.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally and with willful indifference to Mr. Taylor's rights.

206.    The misconduct described in this Count was undertaken pursuant to the policy and practice of the Department in the manner described more fully in the preceding paragraphs and was tacitly ratified by policymakers for the Municipal Defendants with final policymaking authority.

**Count IV - 42 U.S.C. § 1983**
**Conspiracy to Deprive Constitutional Rights: All Defendants**

207.    Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

208.    After Lovings' death, Defendants reached an agreement amongst themselves to frame Mr. Taylor for the crime and to thereby deprive him of his constitutional rights and liberty to be continuously taken away from him, all as described in the various Paragraphs of this Complaint.

209.    In this manner, the Defendants, acting in concert with other unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

210.    In furtherance of the conspiracy, each of the co-conspirators committed overt acts as described in this Complaint and was an otherwise willful participant in joint activity.

211.    As a direct and proximate result of the illicit prior agreement referenced above, Mr. Taylor's rights were violated, and he suffered financial damages, as well as severe emotional distress and anguish, as is more fully alleged above.

212.    The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

213.    The misconduct described in this Count was undertaken pursuant to the policy and practice of the Department in the manner described more fully in the preceding paragraphs, and was tacitly ratified by policymakers for the municipal defendants with final policymaking authority.

**Count V – 42 U.S.C. 1983**
**Equal Protection: All Defendants**

214.    Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

215.    As described more fully above, the Defendants denied Plaintiff equal protection of the law.

216.    Specifically, these Defendants actively participated in or personally caused misconduct in terms of conducting investigations in a manner calculated to deprive minority suspects of their due process rights by withholding material exculpatory evidence and fabricating false evidence of those suspects' guilt. Said misconduct was motivated by racial animus and constituted purposeful discrimination; it also affected minorities in a grossly disproportionate manner vis-a-vis similarly-situated Caucasian individuals.

217.    As a result of this violation, Plaintiff, a Black male, suffered injuries, including but not limited to emotional distress.

218.    The misconduct by the Defendants described in this Count was undertaken pursuant to the policy and practice of the Department in the manner described more fully above.

**Count VI - 42 U.S.C. § 1983**
***Monell* Claim Against Defendant City of Rolling Meadows**

219.    Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

27

220.     The actions of the Rolling Meadows Police Officers in withholding material exculpatory information from Mr. Taylor and his counsel were undertaken pursuant to the policies and practices of the Rolling Meadows Police Department, described above, which were created, maintained, or ratified by policymakers for the City of Rolling Meadows with final policymaking authority.

221.     The policies and practices described in this Count were maintained and implemented by the City of Rolling Meadows with deliberate indifference to Mr. Taylor's constitutional rights.

222.     As a direct and proximate result of the City's actions, Mr. Taylor's constitutional rights were violated and he suffered injuries and damages, as set forth in this Complaint.

223.     The City of Rolling Meadows is therefore liable for the misconduct committed by its officers.

### Count VII
### *Respondeat Superior* Claim Against Municipal Defendants

224.     Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

225.     In committing the acts alleged in the preceding paragraphs, the Defendants Cook, Hinds, Doucet, Gadomski, Barrile, Cardona, Recker, Peters, and Waltzman were members and agents of the Rolling Meadows Police Department, acting at all relevant times within the scope of their employment.  Defendant City of Rolling Meadows is liable as principals for all state law torts committed by their agents.

226.     In committing the acts alleged in the preceding paragraphs, Defendant Tim Sharkey was a member and agent of the Village of Palatine, acting at all relevant times within the

scope of his employment. Defendant Village of Palatine is liable as principals for all state law torts committed by their agents.

227. In committing the acts alleged in the preceding paragraphs, Defendant Al Baumgartner was a member and agent of the Village of Arlington Heights, acting at all relevant times within the scope of his employment. Defendant Village of Arlington Heights is liable as principals for all state law torts committed by their agents.

## **JURY DEMAND**

Plaintiff, PATRICK TAYLOR, hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Respectfully submitted,

/s/ Elliot Slosar
*One of Plaintiff's Attorneys*

Jon Loevy
Elliot Slosar
Katie Montenegro
LOEVY & LOEVY
311 N. Aberdeen, 3rd Floor
Chicago, IL 60607
(312) 243-5900
Fax: (312) 243-5902
elliot@loevy.com

Steven A. Greenberg
GREENBERG TRIAL LAWYERS
53 W. Jackson Blvd., Suite 315
Chicago, IL 60604
(312) 879-9500
Steve@greenbergcd.com