UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| PATRICK TAYLOR,<br>Plaintiff,<br>v.<br>CITY OF ROLLING MEADOWS, et al.,<br>Defendants. | No. 25 CV 12429<br>Judge Manish S. Shah |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Patrick Taylor was convicted of murder and incarcerated for over 15 years despite steadfastly maintaining his innocence. Plaintiff filed several appeals before being granted a new trial. Before his retrial, the Rolling Meadows Police Department produced files containing exculpatory and impeachment evidence that had not previously been disclosed. The State then dropped all charges against plaintiff. He now brings seven claims—five for individual liability under § 1983, a *Monell* claim, and a respondeat superior claim—against eleven police officers and the three municipal corporations that employ them. Of the defendants, five officers and two municipal corporations move to dismiss all claims against them under Rules 12(b)(1) and 12(b)(6). For the reasons discussed below, the motions are granted.

## I. Legal Standards

Federal Rule of Civil Procedure 12(b)(1) governs dismissals based on lack of subject matter jurisdiction. Article III of the Constitution confines the federal judicial power to resolving "cases" and "controversies." *TransUnion LLC v. Ramirez*, 594 U.S.

413, 423 (2021). A case or controversy exists only where the plaintiff has a personal stake in the case (i.e., standing). *Id.* "To establish standing, the plaintiff has the burden of establishing that he has (1) suffered an injury in fact that is concrete, particularized, and actual or imminent; (2) that is fairly traceable to the challenged conduct of the defendant; and (3) that is likely to be addressed by a favorable judicial decision." *Chapman v. Burke*, 2026 WL 2342743, at *3 (7th Cir. Aug. 13, 2026).

Federal Rule of Civil Procedure 12(b)(6) governs dismissals based on failure to state a claim upon which relief may be granted. To survive a 12(b)(6) motion, the complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." *Kaminski v. Elite Staffing, Inc.*, 23 F.4th 774, 776 (7th Cir. 2022) (quoting Fed. R. Civ. P. 8(a)(2)). The complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In evaluating a complaint's sufficiency, courts "accept as true all well-pled facts and make any reasonable inferences in the non-movant's favor." *Brant v. Schneider Nat'l, Inc.*, 43 F.4th 656, 664 (7th Cir. 2022).

## II. Background

In August 2006, Marquis Lovings was murdered inside his Rolling Meadows apartment when a robbery plan went sideways. [1] ¶ 26.[1] Lovings's death was investigated by a joint task force led by Detective Dan Cook of the Rolling Meadows

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings. The facts are taken from the complaint, [1].

Police Department. [1] ¶ 28.[2] Officers from several law-enforcement agencies canvassed the apartment complex looking for potential eyewitnesses. [1] ¶ 29. One such witness was Juanito Gonzalez, who lived in the same building and saw two Black men driving a beige-colored vehicle and acting suspiciously. [1] ¶¶ 31–36.

Law-enforcement officers interviewed Gonzalez at the Rolling Meadows Police Department, and defendant Tim Sharkey of the Palatine Police Department "coercively interrogated Mr. Gonzalez to extract a (false) confession." [1] ¶¶ 39–41. Sharkey threw Gonzalez around the interrogation room and accused him of committing murder. [1] ¶ 42. Sharkey tried to fabricate a false statement from Gonzalez implicating someone else in the murder, but these efforts failed. [1] ¶¶ 44–45. Sharkey also "withheld exculpatory and impeachment evidence concerning Mr. Gonzalez." [1] ¶ 46.

In August 2007, Kenneth Slaughter had a court appearance in Chicago. [1] ¶ 60. Setting out to frame plaintiff Patrick Taylor, Detective Cook led an effort to fabricate a false statement from Slaughter. [1] ¶¶ 57–59. Officers took Slaughter to the Rolling Meadows Police Department in the rear of a squad car and took all his belongings. [1] ¶¶ 62–63. Detective Cook enlisted defendant Al Baumgartner of the Arlington Heights Police Department to conduct a Computerized Voice Stress Analysis test. [1] ¶ 66. Throughout this time, Slaughter maintained that he did not have information regarding the homicide. [1] ¶ 68.

[2] Cook is a defendant in this case but did not move to dismiss.

Officers then transported Slaughter to a nearby motel and continued to deny him access to a phone. [1] ¶¶ 68–70. The next morning, Slaughter was taken for a polygraph and again denied having personal knowledge. [1] ¶¶ 72–74. Detectives then questioned Slaughter again at the Rolling Meadows Police Department, where they threatened him and fed him false information. [1] ¶¶ 75–76. After nearly two days of intense questioning, "Defendants successfully fabricated a false statement for Slaughter that implicated Plaintiff" in the Lovings murder. [1] ¶ 79. Plaintiff specifically alleges that "Defendant Cook and other Defendants" fed Slaughter false information and "Defendant Cook and other Defendants" manufactured the false statement. [1] ¶¶ 80–81.

Cook and another Rolling Meadows detective fabricated a false statement from a third witness. [1] ¶ 92. Rolling Meadows detectives also conducted unduly suggestive identification procedures with eyewitnesses that resulted in misidentifications of plaintiff. [1] ¶ 85. Based on the fabricated evidence, plaintiff was charged with murder. [1] ¶ 95. Between 2007 and 2011, "Defendants" actively took steps to conceal their misconduct and "Defendants" testified falsely. [1] ¶¶ 98–99. In 2011, plaintiff was convicted and sentenced to life imprisonment. [1] ¶¶ 100–101.

Plaintiff filed several appeals and was ultimately granted a new trial beginning in 2016. [1] ¶ 167. In preparation for retrial, plaintiff repeatedly filed discovery motions. [1] ¶ 102. In 2023, the Rolling Meadows Police Department produced containers for inspection. [1] ¶ 103. The containers included thousands of pages of documents ("street files") that had never been disclosed to plaintiff during

the yearslong prosecution of the case. [1] ¶ 105. The documents contained exculpatory and impeachment evidence, including evidence that would have (1) proven the motive for the victim's family to falsely implicate plaintiff; (2) demonstrated that the victim's family was deeply involved in criminal endeavors; (3) shown that the victim's family was uncooperative and controlling the underlying investigation; (4) shown that the victim's family had a demonstrated pattern of witness tampering; (5) linked a beige vehicle to the murder; (6) implicated a different specific suspect in the murder; (7) confirmed that plaintiff did not own or possess a vehicle fitting the description provided by witnesses; (8) demonstrated the falsity of Slaughter's statement; and (9) implicated additional alternate suspects. [1] ¶ 105–106.

Plaintiff names five defendants who he alleges "withheld this exculpatory evidence," including defendants Steven Cardona, Mark Recker, and Ray Peters. [1] ¶ 104. These three defendants are not referenced by name with respect to any other allegations in the complaint.

In April 2023, plaintiff filed a motion to dismiss the charges based on this newly disclosed information. [1] ¶ 178. In October 2023, the State dropped the charges. [1] ¶ 182. Plaintiff ultimately spent over 15 years in prison for the murder of Marquis Lovings (including the seven years he spent awaiting retrial). [1] ¶¶ 171–172. He now brings § 1983 claims against eleven officers and three municipalities who employ them alleging that they violated his due process rights, [1] ¶¶ 183–191; deprived him of liberty without probable cause, [1] ¶¶ 192–201; failed to intervene,

[1] ¶¶ 202–206; conspired to deprive his constitutional rights, [1] ¶¶ 207–213; and denied him equal protection of the law, [1] ¶¶ 214–218.

Defendants Baumgartner and the Village of Arlington Heights, defendants Recker, Peters, Sharkey, and the Village of Palatine, and defendant Cardona move to dismiss all claims against them.

## III. Analysis

### A. Article III Standing

Defendants Baumgartner, Cardona, and Sharkey argue that plaintiff lacks standing to pursue his claims against them. [57] at 12–14; [82] at 8–10; [69] at 7. Specifically, they contest plaintiff's ability to meet the causation requirement. A "causal connection between the injury and the conduct complained of must exist for a plaintiff to have standing." *Chapman*, 2026 WL 2342743, at *4 (citation omitted). In other words, the injury must be fairly traceable "to the challenged action of the defendant" and not the result of "the independent action of some third party not before the court." *Id.* "The causal chain cannot be too attenuated or rest on conjecture." *Id.*

#### *1. Defendant Baumgartner*

Defendant Baumgartner makes a facial challenge to plaintiff's standing. Therefore, I accept all well-pleaded allegations as true and draw all reasonable inferences in plaintiff's favor. *See In re Recalled Abbott Infant Formula Prods. Liab. Litig.*, 97 F.4th 525, 528 (7th Cir. 2024).

Baumgartner conducted a Computerized Voice Stress Analysis test of Slaughter that plaintiff alleges was nothing more than a ruse and part of a larger conspiracy to manufacture a fabricated statement that implicated him. [1] ¶ 67; [98] at 12. Though plaintiff need not establish that Baumgartner's conduct was a proximate cause of his injuries, *see Taylor v. Salvation Army Nat'l Corp.*, 110 F.4th 1017, 1025 (7th Cir. 2024), the causal chain between Baumgartner's conduct and plaintiff's wrongful conviction is too attenuated to confer standing. The Computerized Voice Stress Analysis test was unsuccessful at obtaining a fabricated statement from Slaughter. [1] ¶ 68. It was not until the following day—after a polygraph and subsequent interrogation that had Slaughter "scared for his life"—that he ultimately made a statement. [1] ¶¶ 72–79. The complaint specifically names the two Rolling Meadows police officers who conducted this interrogation. [1] ¶ 75. And though plaintiff uses the term "Defendants" to broadly implicate all defendants named in the complaint, plaintiff does not allege that Baumgartner continued to assist in the investigation after the stress test failed to obtain a statement.

Plaintiff responds that he "has alleged how Baumgartner was solicited to join the conspiracy and subsequently administered a sham [stress analysis] test to Slaughter." [98] at 19. But the complaint alleges only that Detective Cook enlisted Baumgartner to conduct the test; it does not allege that Baumgartner was enlisted to extract a fabricated statement implicating plaintiff. [1] ¶ 66. The alleged ruse, [1] ¶ 67, does not permit an inference that Baumgartner agreed to elicit false information or that Baumgartner knowingly agreed to frame Taylor with false evidence.

Standing is a defendant-specific inquiry. *See Doe v. Holcomb*, 883 F.3d 971, 978 (7th Cir. 2018). As alleged, Baumgartner's conduct was not directed at Taylor and did not result in any fabricated evidence, leaving only a conspiracy theory for standing.[3] But even that theory is too attenuated from Baumgartner's role in the investigation. To have standing to sue Baumgartner, plaintiff must trace his injury to an agreement that Baumgartner joined—something that plaintiff has not alleged here. Similarly, with respect to his failure-to-intervene claim, plaintiff has not alleged that Baumgartner—a member of an outside police department—was in a position to stop any alleged constitutional violation. His inaction is not fairly traceable to plaintiff's injury.[4]

---

[3] Plaintiff has not alleged that Baumgartner was personally involved in maliciously prosecuting him or denying him equal protection. His liability for these alleged constitutional violations is contingent on his participation in a conspiracy.

[4] Causation for standing and the adequacy of the allegations in stating a claim for relief are doctrinally distinct and jurisdiction comes first. *See Zurbriggen v. Twin Hill Acquisition, Inc.*, 178 F.4th 1081, 1086 (7th Cir. 2026). But because plaintiff may try to replead a claim against Baumgartner, I note that Taylor has not alleged a constitutional violation against Baumgartner. Coercively interrogating witnesses does not constitute a due-process violation. *Avery v. City of Milwaukee*, 847 F.3d 433, 439 (7th Cir. 2017). Unlike falsified evidence and perjured testimony, coerced testimony may turn out to be true. *Id.* Here, the stress test conducted by Baumgartner is more akin to coercive interrogation than fabricated testimony. Though plaintiff specifically alleges that *other* defendants fabricated false statements from witnesses, he does not allege that Baumgartner did so, where his attempt to coerce did not result in false evidence and was too attenuated from Slaughter's eventual statement (which was not made until after he was threatened and fed false information by other officers). Absent Baumgartner's involvement in an articulable constitutional violation, plaintiff's § 1983 claims against him cannot succeed, and without a plausible allegation that Baumgartner knowingly agreed to participate in a common venture to fabricate evidence, conspiratorial liability does not attach to Baumgartner for other officers' torts. *See Daugherty v. Page*, 906 F.3d 606, 612 (7th Cir. 2018) (elements of § 1983 conspiracy liability require an underlying constitutional violation and an agreement to inflict that constitutional harm); *Smith v. Gomez*, 550 F.3d 613, 617 (7th Cir. 2008) (conspiracy is not an independent basis of liability in § 1983 actions); *see also Arbuckle v. Wilcox*, No. 20 CV 1419, 2021 WL 5321552, at *9 (N.D. Ill. Nov. 16, 2021) (dismissing standalone conspiracy claim involving only state

*2. Defendant Sharkey*

Defendant Sharkey also makes a facial challenge to plaintiff's standing. Here, plaintiff alleges that Sharkey coercively interrogated Gonzalez in an effort to extract a false confession. [1] ¶¶ 41–42. He then tried to have Gonzalez implicate someone else in the murder. [1] ¶ 44. Not only did these efforts fail, [1] ¶ 45, but Sharkey's interrogation of Gonzalez occurred an entire year before "Defendants set out to frame Mr. Taylor." [1] ¶ 57. Plaintiff does not allege that Sharkey participated in the interrogation of Slaughter or any other witness who implicated plaintiff in the murder. To the contrary, Sharkey is not referenced by name in the rest of the complaint. Like Baumgartner's stress analysis test, Sharkey's conduct with respect to Gonzalez's interrogation is not fairly traceable to plaintiff's injury, no matter how the facts alleged in the complaint are construed.[5]

This is true even with respect to plaintiff's conspiracy claim. Plaintiff alleges that "Defendants reached an agreement amongst themselves to frame Mr. Taylor for the crime." [1] ¶ 208. But that conclusory allegation is inconsistent with the specific allegations of Sharkey's participation, occurring before any decision to frame Taylor. *See* [1] ¶¶ 39–45 (Sharkey interrogated Gonzalez in 2006); [1] ¶¶ 57–59 (Cook leads the effort to frame Taylor in 2007). The causal chain between Sharkey and plaintiff

---

actors because conspiracy is a theory of liability for a substantive violation, not a claim for relief).

[5] Also like Baumgartner, defendant Sharkey was not a member of the Rolling Meadows Police Department, which led the investigation. Plaintiff has not alleged that Sharkey had a realistic opportunity to intervene to stop the violation of plaintiff's constitutional rights (where plaintiff is not alleged to have been a person of interest at the time of Gonzalez's interview). *See Lewis v. Downey*, 581 F.3d 467, 473 (7th Cir. 2007).

being wrongfully convicted based on the fabricated statements of other witnesses is too attenuated to confer standing.

Plaintiff also alleges that "Defendant Sharkey withheld exculpatory and impeachment evidence concerning Mr. Gonzalez." [1] ¶ 46. But this conclusory allegation merely reciting the elements of a *Brady* violation is not entitled to a presumption of truth. *See McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011). Here, Sharkey was employed by a department that was not leading the investigation and conducted an interview that failed to produce usable evidence. Any injuries that plaintiff sustained from officers conspiring to fabricate statements against him are not fairly traceable to Sharkey's conduct.[6] Plaintiff lacks standing over defendant Sharkey and the claims against him are dismissed.

*3. Defendant Cardona*

Finally, defendant Cardona argues that plaintiff lacks standing against him because Cardona was no longer participating in the investigation by the time plaintiff was identified as a person of interest. [82] at 8–10. Unlike defendants Baumgartner and Sharkey, Cardona raises a factual challenge to plaintiff's standing and attaches six exhibits to his motion to dismiss in support of his argument.

In contrast to a facial challenge, "a factual challenge lies where the complaint is formally sufficient but the contention is that there is *in fact* no subject matter jurisdiction." *Apex Digit., Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 444 (7th Cir.

---

[6] Plaintiff's argument also fails on the merits because plaintiff does not allege that Sharkey concealed this evidence or agreed that other officers would suppress it (as required for a *Brady* violation).

2009) (emphasis in original) (internal quotation marks and citation omitted). When considering a factual challenge to jurisdiction, the "district court may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists." *Id.* (internal quotation marks and citation omitted).

Here, Cardona's exhibits establish that he assisted in the homicide investigation only for its first week—in August 2006. [94]. While activated, Cardona helped canvass the neighborhood, interview associates of the victim, prepare Grand Jury subpoenas, and review telephone records. [94] at 4. Though Gonzalez was interviewed during this time period, plaintiff does not allege that Cardona participated in the interrogation. Even if he had, as discussed above, conduct pertaining to Gonzalez's interrogation is insufficient to confer standing for plaintiff's § 1983 claims that arose from his wrongful conviction years later.

Plaintiff challenges Cardona's evidence as being voluminous, inappropriately advancing a merits defense, and injecting factual disputes. [98] at 13–14.[7] Plaintiff does not, however, challenge the authenticity of Cardona's records or the factual assertion that his role ceased a week into the homicide investigation. Plaintiff did not become a person of interest in the Lovings case until long after Cardona was

[7] Plaintiff's court filings pertaining to his petition for a Certificate of Innocence, request for additional discovery, and motion to dismiss are subject to judicial notice, *see White v. Keely*, 814 F.3d 883, 885 n.2 (7th Cir. 2016), but they are not relevant to his standing argument. Plaintiff was not required to allege in those proceedings that Cardona had participated in any misconduct and the fact that they omit reference to him does not establish as a matter of law that the allegations in the present complaint are implausible.

deactivated from the Major Case Assistance Team and any misconduct he may have committed during his one-week activation is not fairly traceable to plaintiff's injuries.

Plaintiff's claims against defendants Baumgartner, Sharkey, and Cardona are dismissed for lack of standing.[8]

### B. Defendants Recker and Peters

Defendants Recker and Peters do not challenge plaintiff's standing to bring his claims against them. They instead argue that he has failed to state a claim under Rule 12(b)(6). [69] at 4–6. Plaintiff alleges that Recker and Peters withheld the exculpatory evidence contained in the street files. According to plaintiff, this conduct is sufficient to support his various § 1983 claims against them. *See* [98] at 19–23.

Specifically, plaintiff argues that his "conspiracy claim must proceed" because the complaint "alleges overt acts by Defendants." [98] at 20 n.7. But to state a § 1983 conspiracy claim, plaintiff must first plausibly allege that defendants have deprived him of a constitutional right. *See Ind. Land Trust #3082 v. Hammond Redev. Comm'n*, 107 F.4th 693, 700 (7th Cir. 2024). The same rule applies to a failure-to-intervene claim: "In order for there to be a failure to intervene, it logically follows that there must exist an underlying constitutional violation." *Rosado v. Gonzalez*, 832 F.3d 714, 718 (7th Cir. 2016) (citation omitted).

---

[8] Defendant Cardona moves in the alternative to dismiss under Rule 12(b)(6). [82] at 10–17. However, courts must address jurisdiction before turning to the merits. *Zurbriggen v. Twin Hill Acquisition, Inc.*, 178 F.4th 1081, 1086 (7th Cir. 2026). Where the court is without jurisdiction to address the merits of the case, the inquiry ends there. *See MAO-MSO Recovery II, LLC v. State Farm Mut. Auto. Ins.*, 935 F.3d 573, 583 (7th Cir. 2019).

Plaintiff's complaint alleges two distinct due-process violations: that defendants fabricated evidence and that defendants withheld material exculpatory evidence. (As discussed above, coercively interrogating a witness does not amount to a due-process violation.) With respect to defendants Recker and Peters, plaintiff has alleged only that they withheld exculpatory evidence. [1] ¶ 104. Therefore, to proceed on his § 1983 due-process claim against them, the question is whether plaintiff has adequately raised a *Brady* claim against defendants Recker and Peters or alleged that Recker and Peters agreed that other officers would suppress exculpatory evidence.[9]

The suppression of material, exculpatory evidence in a criminal case violates due process. *Brady v. Maryland*, 373 U.S. 83, 87 (1963). The duty to disclose exculpatory evidence primarily belongs to the prosecution, but it extends to police officers insofar as they must turn over potentially exculpatory evidence to the prosecution. *Moran v. Calumet City*, 54 F.4th 483, 492 (7th Cir. 2022). To prevail on a *Brady* suppression claim against defendants, plaintiff must prove that (1) the undisclosed evidence was favorable to him; (2) the evidence was concealed by the officer; and (3) the concealed evidence resulted in prejudice. *Id.*

[9] Plaintiff argues that his "allegations make out an unmistakable due process fabrication claim, based on allegations that these Defendants (including Cardona) withheld exculpatory and impeaching evidence that they were obligated to disclose pursuant to *Brady* and its progeny." [98] at 26. But this statement conflates the two constitutional violations. Manufacturing false evidence against a criminal defendant is different from withholding exculpatory evidence. Though plaintiff alleges facts pertaining to an evidence-fabrication claim against certain defendants, he has not alleged sufficient facts to tie defendants Recker and Peters to this constitutional violation.

A plaintiff cannot show that a police officer suppressed evidence if the prosecution was aware of it. *Id.* In other words, officers "discharge their *Brady* duty by turning over exculpatory evidence to the prosecutor" and triggering her disclosure obligation. *Id.* (quoting *Beaman v. Freesmeyer*, 776 F.3d 500, 512 (7th Cir. 2015)). Here, it is unclear whether the prosecutor was aware of the evidence contained in the street files. To the extent she was, a *Brady* claim against the officers cannot survive. *See Mims v. City of Chicago*, 155 F.4th 970, 975 (7th Cir. 2025).

But even if the prosecutor were unaware of the exculpatory evidence contained in these files, plaintiff has not plausibly alleged that the evidence was concealed by the moving defendants. Plaintiff's only specific allegation with respect to defendants Recker and Peters (as well as Cardona) is that they "withheld this exculpatory evidence." [1] ¶ 104. This recitation of the legal element of a *Brady* claim is not enough to state a claim to relief against Recker and Peters.

Indeed, there are no factual allegations about Recker and Peters that move the claims across the plausibility threshold articulated in *Twombly* and *Iqbal*. While the complaint adequately alleges that the materials contained in the files were material and exculpatory, defendants Recker and Peters are left wondering what they did to suppress this evidence. Neither defendant was employed by the City of Rolling Meadows (who was responsible for the prosecution and who possessed the exculpatory documents). Nor has plaintiff alleged that they participated in the interrogations that led to the fabricated statements. Though plaintiff argues that defendants' withholding of evidence occurred in furtherance of a conspiracy to deprive

him of his due-process rights, [98] at 20, plaintiff's conclusory allegation paired with his statement articulating defendants' role in the conspiracy does not make the evidence fabrication and *Brady* violations by others foreseeable to Recker and Peters. Even construing the allegations in a light favorable to plaintiff, he has not plausibly alleged that these defendants were aware of the fabricated statements, not to mention went so far as to conspire with officers from another police department to conceal them.

The same logic applies with respect to plaintiff's malicious-prosecution and equal-protection claims against defendants Recker and Peters. Plaintiff does not specifically allege that Recker and Peters engaged in such violations, but he theorizes that all defendants agreed to violate his rights by fabricating evidence, maliciously prosecuting him, suppressing evidence, and denying him equal protection. For conspiratorial liability, the official need not have agreed on the details of the scheme, but he must understand the scheme's general objectives, accept them, and agree to do his part to further them. *See McCann v. Mangialardi*, 337 F.3d 782, 789 (7th Cir. 2003). Plaintiff has not plausibly alleged that Recker and Peters conspired with others to violate his constitutional rights—or (on a failure-to-intervene theory of liability) that they had a realistic opportunity to stop the violations. *See Lewis*, 581 F.3d at 472.

To be clear, plaintiff's complaint is deficient with respect to these defendants on notice-pleading grounds, not on group-pleading grounds. While defendants make the additional argument that plaintiff's complaint should be dismissed due to

improper group pleading, [69] at 8–9, there is no doctrine that explicitly forbids allegations against defendants collectively. What matters is whether the allegations in a complaint are sufficient to put individual defendants on notice of the claims against them and the conduct they are based on. *See Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009) (noting that factual allegations must give defendants fair notice of what the claim is and the grounds upon which it rests).

While plaintiff may have alleged specific facts with respect to other defendants in the case, plaintiff has not adequately pled that the moving defendants were personally involved in each of the § 1983 claims he brings. "Without more, [plaintiff's] allegations are too vague to provide notice to defendants of the contours of his [claims]." *Brooks*, 578 F.3d at 581–82. Labeling every defendant a coconspirator is not enough. Defendants Recker and Peters' motion to dismiss is granted.

### C. Respondeat Superior Claim

Because the claims against their respective officers have been dismissed, all claims against the Villages of Arlington Heights and Palatine are dismissed as well. Even if this were not the case, "the doctrine of respondeat superior does not apply to § 1983 actions. *See Ollison v. Gossett*, 136 F.4th 729, 735 (7th Cir. 2025). Municipal liability for § 1983 claims attaches only where the alleged constitutional violation resulted from the municipality's own policy, practice, or custom. *See First Midwest Bank Guardian of Est. of LaPorta v. City of Chicago*, 988 F.3d 978, 986 (7th Cir. 2021).

Despite alleging that the Village of Arlington Heights and the Village of Palatine are liable "for all state law torts committed by their agents," [1] ¶¶ 226–227,

plaintiff does not actually plead any state-law torts in his complaint. Further, despite using *Monell*-like language in his § 1983 claims against Arlington Heights and Palatine, plaintiff makes a separate and explicit *Monell* claim against only defendant City of Rolling Meadows. [1] ¶¶ 219–223. Thus, absent an articulable *Monell* theory against the moving municipalities, the villages cannot be held liable for the acts of their agents.[10]

## IV. Conclusion

Defendants Recker, Peters, Sharkey, and the Village of Palatine's motion to dismiss, [68], is granted. Defendant Al Baumgartner and the Village of Arlington Heights's motion to dismiss, [58], is granted. Defendant Cardona's motion to dismiss, [82], is granted. All claims are dismissed against these defendants without prejudice.[11]

ENTER:

Manish S. Shah
United States District Judge

Date: August 25, 2026

---

[10] The municipal defendants moved to dismiss the respondeat superior claims against them, and plaintiff did not respond to these arguments. Plaintiff also did not argue that he intended to extend his *Monell* claim beyond the City of Rolling Meadows.

[11] A dismissal for lack of standing precludes a dismissal with prejudice. *See Flynn v. FCA US LLC*, 39 F.4th 946, 954 (7th Cir. 2022). Further, plaintiff has requested leave to amend, [98] at 33, and plaintiffs are "generally entitled to at least one chance to amend their complaint to cure an error in response to a district court's dismissal order unless amendment would be futile." *Hernandez v. Ill. Inst. of Tech.*, 63 F.4th 661, 671–72 (7th Cir. 2023) (internal quotation marks and citation omitted).